CORNELIUS P. MCCARTHY (CM-3544)
CHEHEBAR DEVENEY & PHILLIPS
485 Madison Avenue Suite 1301
New York, New York 10022
Tel.: 212-532-8204
Fax: 212-753-8101
E-mail: cmccarthy@cdlawllp.com

PIERCE O'DONNELL (PO-5724)
GREENBERG GLUSKER FIELDS CLAMAN &
MACHTINGER LLP
2049 Century Park East, Suite 2600
Los Angeles, California 90067
Telephone:  310.553.3610
Fax:  310.553.0687
Email: PODonnell@ggfirm.com

Attorneys for Plaintiff
William T. Walters

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

| | |
|---|---|
| WILLIAM T. WALTERS, | : |
| Plaintiff, | : |
| -against- | : |
| PREETINDER BHARARA, DAVID CHAVES, GEORGE VENIZELOS, RICHARD ZABEL, TELEMACHUS KASULIS, DANIEL GOLDMAN, and DOES 1-50, INCLUSIVE, | : |
| Defendants. | : |

Case No. 20-CV-8803

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

**JURY TRIAL DEMANDED**

---------------------------------------- X

Plaintiff William T. Walters ("Walters" or "Plaintiff"), by and through his undersigned

counsel of record, hereby alleges as follows:

## INTRODUCTION

1.      This case involves corrupt and illegal conduct by individual members of the U.S. Department of Justice in direct violation of Plaintiff William "Billy" Walters' fundamental constitutional rights.  It is no secret that, for years, federal law enforcement agents have used members of the media to promote their investigative agenda through illegal leaks of confidential information.  This is the rare case in which the Department of Justice ("Department" or "DOJ")—after first falsely denying the existence of any such leaks in court papers—was forced to admit on the eve of an evidentiary hearing that illegal leaks had occurred.  Moreover, prosecutors also admitted that the source of the leaks was Defendant David Chaves, the senior supervisory agent overseeing all white-collar crime investigations in the New York Field Office of the Federal Bureau of Investigation ("FBI").

2.      In a remarkable court filing, the DOJ confessed that its agent had systematically fed secret investigative information to reporters at *The New York Times* and *The Wall Street Journal* with the intent (and effect) of promoting the investigation into Walters, a prominent businessman, retired sports bettor and philanthropist.  The DOJ also admitted that senior officials in the United States Attorney's Office in Manhattan had knowledge of the leaks in real time and intentionally chose not to investigate the illegal activity for 2½ years—in derogation of their mandatory duty.  The failure to intercede for so long is all the more reprehensible because only a few FBI agents had access to the leaked materials and the primary culprit (FBI Supervisory Special Agent Chaves) confessed as soon as he was eventually interviewed.

3.      The essence of this conspiracy orchestrated by the DOJ is illustrated by the Government's interactions with *The New York Times*.  In a front-page story on May 31, 2014, *The Times* reported that the FBI, the Securities and Exchange Commission ("SEC"), and "federal

92101-00002/3876779.18

prosecutors in Manhattan" were investigating Walters, professional golfer Phil Mickelson, and Wall Street investor Carl Icahn for possible insider trading related to Clorox stock.  The article disclosed that the "investigation ha[d] dragged on for more than two years without yielding definitive evidence of insider trading."

4.      Similar articles, rife with secret Government investigative information, appeared during the next several days in both *The Times* and *The Wall Street Journal*.  The primary source of information—notwithstanding the many legal and ethical prohibitions against such leaks—was the DOJ itself, whose motivation was aptly described by *The Journal*: "After news reports, the subjects of investigations will often discuss the reports or take actions to avoid being caught, and those maneuvers can cause them to get caught."  Indeed, at that exact time, the DOJ had placed a live (but ultimately fruitless) wiretap on Walters' phone.  The intentional leaks were designed "to tickle the wire"—an unlawful investigative technique long favored by the DOJ.

5.      Yet for all the fanfare of the front-page news—and the embarrassment and distress it caused Walters and his family—it was not even true.  Not long after publishing the articles, *The Times* learned that professional golfer Phil Michelson had traded shares in Dean Foods, not Clorox, and the newspaper issued a correction stating that it had "overstated the scope" of the investigation.  Although *The Times* owned up to its mistake, Chaves doubled down.

6.      Offended by the retraction, Chaves—who had planted this fake news— responded by threatening the reporter and *The Times*. When Deputy U.S. Attorney Richard Zabel—second-in-command to U.S. Attorney Preet Bharara—learned about the illegal leaks, he recommended to his superiors in New York that "this [not] be discussed generally right now for a number of reasons."  Zabel added that prosecutors, presumably at some point in the future, "need to address this with the FBI."  Yet it is now evident that, aside from issuing perfunctory internal warnings,

the individual federal law enforcement officials named in this action made no serious effort to investigate the sources or otherwise stop the leaks.

7.      After years of denying and covering up the leaks (and going so far as to falsely deny in court filings that any Government officer had perpetrated them), the DOJ abruptly made an about-face on the eve of getting caught.  In anticipation of a court hearing on December 21, 2016, U.S. Attorney Bharara, in an 11th-hour letter to the trial judge, admitted: "It is now an incontrovertible fact that FBI leaks occurred, and that such leaks resulted in confidential law enforcement information about the Investigation being given to reporters."

8.      For his part, the trial judge in the Walters case said he was "shocked" by these disclosures, having initially been "skeptical that the allegations could possibly be true."  The judge stated that he was not "cynical enough to think that [he] was going to learn of deliberate disclosures by a special agent of the FBI."  But it was all true, leaving the judge to remark on a poignant irony: "Mr. Walters is charged with, among other things, tipping material nonpublic information to another.  And to help support that case, the special agent apparently tipped material nonpublic information improperly to another.  That's what we have here."

9.      Bharara himself admitted during a paid speaking appearance in 2017 at the University of Nevada Las Vegas Law School that Chaves had engaged in illegal conduct: "Now, a particular agent . . . did a terrible thing and will suffer the consequences and he should.  He absolutely should."

10.     Despite the DOJ's damning confessions—and the trial court's finding—that the Government misconduct had violated Walters' fundamental guarantees of fairness in the criminal justice process, the Government officials who perpetrated the leaks and covered them up suffered no consequences *en route* to trying and convicting Walters of insider trading.

Indeed, this travesty is compounded by the fact that Chaves—the supervising FBI agent and admitted leaker—was never prosecuted nor received any known discipline.  To the contrary, Chaves was promoted and allowed to retire with full benefits in 2017.  Meanwhile, the victim of this egregious misconduct—a lifelong benefactor of numerous charitable organizations who built a world-class company from nothing—was convicted despite a manifestly unjust and unconstitutional investigation.

11.     The conspiracy to deny Walters his constitutional rights was no isolated incident. It has recently come to light that Chaves has been implicated in at least a half-dozen reported instances of improper or illegal investigative behavior.  Remarkably, this pattern of misconduct has gone completely unpunished.

12.     While Walters maintains his innocence, this lawsuit does not seek to challenge his conviction of insider trading.  Walters has been tried and sentenced, and he is now paying his debt to society, even though the underlying allegations against him were based on false testimony and improperly procured evidence.

13.     It is well documented that the DOJ and the FBI—from the highest levels to rank-and-file attorneys and agents—have for years deployed leaks as powerful weapons against public officials, criminal suspects, and ordinary citizens.  This culture of systemic lawlessness subverts the rule of law and yields the kind of abuses seen in the Walters case.

14.     Within the DOJ, the Southern District of New York has long been a hotbed of official corruption, with widespread use of leaks and negative publicity to secure convictions and promote the careers of prosecutors such as Bharara, Zabel, and Assistant United States Attorneys Telemachus Kasulis and Daniel Goldman, and FBI agents such as Chaves and Assistant Director in Charge of the New York Field Office George Venizelos.  In connection with the Walters case,

92101-00002/3876779.18

*The Wall Street Journal* opined about "a pattern of troubling behavior and a problematic culture inside Mr. Bharara's old shop."

15.     During his tenure as U.S. Attorney for the Southern District of New York, Bharara was a notorious media hound.  Bharara's personal intervention in the arrest of Walters demonstrates the extreme lengths he went to covet publicity for himself and use the media to his own advantage.  Walters was taken into custody in 2016 by a team of FBI agents in Las Vegas, Nevada.  The agents didn't book Walters into a federal detention facility per standard procedures (or even perp walk him in front of waiting television cameras).  Instead, they drove Walters 15 miles to the JW Marriott Las Vegas Resort & Spa, where they put him up overnight in a one-bedroom suite with five federal agents and ordered him room service—all at taxpayer expense.  Walters had a simple question for the agents: Why am I here?  They explained that Bharara had scheduled a press conference the next morning to crow about the arrest and did not want the local media to scoop him.  The next day, Walters was taken to a federal intake facility after Bharara held a Manhattan news conference and issued a press release announcing the arrest.  In the release, Bharara said "we don't let corruption stand."  Yet that is exactly what happened here: Bharara let stand corrupt and illegal behavior by FBI agents and his own team of prosecutors so they could build their case against Walters.

16.     The primary relief Walters seeks here is a definitive judicial declaration that the individual Defendants conspired to rob him of due process.  This pattern of misconduct not only damaged Walters but undermined the constitutional assurance of the fundamental fairness of the federal criminal investigative apparatus.  Citizens suspected of crimes by federal officials have a constitutional right to be treated fairly.

17.     This lawsuit is Walters' last hope to expose the criminal misconduct by Chaves

and the cover-up organized by his superiors—Bharara, Zabel, Venizelos, Kasulis, and Goldman. These Defendants were legally obligated to immediately investigate, prevent, and plug the leaking of confidential investigative information.  In his pursuit of justice, Walters hopes that his fellow citizens will also benefit from exposing the systematic lawlessness of those sworn to uphold the law and the Government's failure to punish wrongdoing of its own.

## SUBJECT MATTER JURISDICTION

18.     Plaintiff asserts claims against certain identified members and former members of the FBI and the U.S. Attorney's Office for the Southern District of New York for violating his constitutional rights.  This action is brought pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

19.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

## VENUE

20.     Venue is proper in this District because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district.  *See* 28 U.S.C. § 1391(b).

21.     Defendants, and each of them, committed the unlawful acts described in this Complaint primarily within the Southern District of New York.  The criminal investigation, in which Defendants engaged in their illegal and unconstitutional conduct, was operated from and within the Southern District of New York.  In particular, at the times relevant to this Complaint, Defendants Bharara, Zabel, Kasulis, and Goldman each worked in the U.S. Attorney's Office for the Southern District of New York; Defendants Chaves and Venizelos worked in the FBI's New York Field Office.

## PARTIES

22.     A resident of Nevada since 1982, Plaintiff William "Billy" Walters is a former

92101-00002/3876779.18

sports bettor, championship poker player, and chief executive of a successful business with investments in real estate, golf resorts, and other industries.  A renowned philanthropist, Walters is a lifelong benefactor of numerous charitable causes, including Opportunity Village, a Las Vegas-based nonprofit that provides employment, vocational training, and recreational services to people with intellectual and developmental disabilities.

23.     Defendant Preetinder Bharara was the United States Attorney for the Southern District of New York and the senior-most DOJ official responsible for enforcing compliance with the law by all DOJ employees, including FBI special agents working on investigations conducted by his office.  Before he was fired by President Donald Trump, Bharara was personally responsible for supervising the U.S. Attorney's Office in connection with the Walters investigation, including the actions of his prosecutors and FBI agents.  Bharara became fully aware of the existence of the campaign of illegal leaking directed at Walters.  Despite his legal obligation to investigate, Bharara was instrumental in intentionally covering up the source of the leaks and intentionally misleading the trial judge in Walters' criminal case.  Bharara used his tenure as the springboard for a lucrative career as an attorney, law professor, author, and legal analyst for CNN.  At all relevant times, Bharara was acting under color of federal law and as an employee of the U.S. Government.  Bharara is named in his individual capacity.

24.     Defendant David Chaves was the FBI Supervisory Special Agent in charge of the criminal investigation into Walters and others.  Chaves has since admitted that he was the primary leaker of confidential grand jury and other information about the Walters investigation to various media outlets—a federal crime.  After his retirement, Chaves has exploited his experience on the Walters and other alleged insider trading and fraud prosecutions into a lucrative career in the securities industry and as a paid speaker on the lecture circuit.  At all

relevant times, Chaves was acting under color of federal law and as an employee of the U.S. Government.  Chaves is named in his individual capacity.

25.     Defendant George Venizelos was the FBI Assistant Director in Charge of the New York Field Office and the DOJ supervisor responsible for assuring compliance with the law by its employees, including Chaves.  From its inception, Venizelos learned that a member of his field office was engaged in a systematic campaign of illegal grand jury leaks. Upon information and belief, Venizelos deliberately took no meaningful steps to investigate, halt, or otherwise remedy this illegal conduct.  After his retirement, Venizelos has held several lucrative positions in the corporate world based on his FBI leadership roles.  At all relevant times, Venizelos was acting under color of federal law and as an employee of the U.S. Government.  Venizelos is named in his individual capacity.

26.     Defendant Richard Zabel was the Deputy United States Attorney and second-in-command of the U.S. Attorney's Office for the Southern District of New York who reported directly to Bharara.  Zabel also learned of the illegal leaking during the course of the investigation.  Upon information and belief, Zabel deliberately took no meaningful actions to investigate, stop, or remedy the leaking.  After he left the USAO, Zabel became General Counsel, Chief Legal Officer and Head of Research of Elliott Management Corporation, a New York-based global investment fund, and accepted a teaching position at Columbia Law School. At all relevant times, Zabel was acting under color of federal law and as an employee of the U.S. Government.  Zabel is named in his individual capacity.

27.     Defendant Telemachus Kasulis was an Assistant United States Attorney who was in day-to-day charge of the Walters' investigation.  Kasulis contemporaneously learned of the illegal leaking; yet, upon information and belief, he deliberately took no meaningful actions to

investigate, stop, or remedy the leaking.  Kasulis used his experience at the USAO to become

partner at Morvillo Abramowitz Grand Iason & Anello PC, a prominent New York criminal

defense law firm, specializing in commodities and securities fraud.  At all relevant times, Kasulis

was acting under color of federal law and as an employee of the U.S. Government.  Kasulis is

named in his individual capacity.

28.     Defendant Daniel Goldman was an Assistant United States Attorney who

eventually investigated the source of the leaks, submitted pleadings containing knowingly false

and misleading statements in furtherance of the USAO's cover-up and obstruction of justice, and

was one of the lead prosecutors at Walters' trial.  Goldman parlayed his experience at the USAO

into work as a TV legal analyst and a prominent legal career, including as legal counsel to the

House Judiciary Committee in the impeachment inquiry of President Donald Trump.  His

Wikipedia page touts his role on the Walters prosecution team.  At all relevant times, Goldman

was acting under color of federal law and as an employee of the U.S. Government.  Goldman is

named in his individual capacity.

29.     The true names and capacities of the defendants named herein as Does 1 through

50 are unknown to Plaintiff, who therefore sues said defendants by such fictitious names.

Plaintiff will amend this Complaint to show the true names and capacities when they have been

ascertained.  Plaintiff is informed and believes, and based thereon alleges, that Does 1 through 50

were responsible in some manner for the unlawful acts hereinafter alleged and are liable to

Plaintiff therefor.

30.     Plaintiff is informed and believes, and based thereon alleges, that at all times

herein mentioned, each of the Defendants, including the Doe defendants, was the agent of one or

more of the other defendants, and was at all times herein mentioned acting within the scope of

such agency.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### Federal Law Enforcement and its Duty to Ensure Fair and Secret Investigations.

31.     In the federal judicial system, the United States Department of Justice ("DOJ") is entrusted with investigating and prosecuting federal crimes.  For each of the nation's 94 federal judicial districts, the President appoints a United States Attorney ("USA") whose responsibility is to represent the United States in all criminal proceedings.  The USA has plenary authority regarding criminal matters.

32.     The USA hires attorneys and other staff to carry out his duties.  The USA is responsible for the acts of his/her subordinates.

33.     One of the USA's primary duties is the investigation of suspected criminal conduct.  A United States Attorney's Office ("USAO") has a Criminal Division managed by a Chief and a Deputy Chief.  Within the Criminal Division, individual prosecuting attorneys are responsible for specific investigations and presenting evidence to the grand jury to obtain an indictment.

34.     While the USA delegates authority to these subordinates, the USA remains ultimately responsible for their conduct.  When the USA receives any credible information that misconduct in the administration of criminal justice within the USAO has occurred, he/she must promptly and thoroughly investigate.  Failure to do so is actionable.

35.     In connection with conducting criminal investigations, the USAO is assisted by numerous federal law enforcement agencies such as the FBI.  In major metropolitan regions such as New York City, the FBI operates a Field Office managed by the Assistant Director in Charge ("ADC") who is assisted by five or more Special Agents in Charge who supervise several

-11-

hundred Special Agents.  Like the USA, the ADC is responsible for the actions of subordinates and is charged with the legal duty to investigate possible unlawful conduct by them.

36.     Customarily, FBI Special Agents and the USAO work cooperatively in developing a criminal case with the Special Agents doing the field work and the USAO supervising the investigators and handling such legal work as search warrants and Title III wiretap applications.

37.     If the USAO seeks to charge a suspect with a felony, the Fifth Amendment requires that a grand jury must issue an indictment.  The USAO functions as the attorney for the grand jury.  Thus, the presentation of evidence to the grand jury and furnishing of legal advice is done by the USAO.  Typically, FBI agents testify before the grand jury about the results of their investigation, and they are privy to all of the evidence presented to the grand jury.

38.     By longstanding law and custom, the proceedings of a federal grand jury are secret, as required by Rule 6(e) of the Federal Rules of Criminal Procedure.   Secrecy is designed to protect several compelling interests.  This includes encouraging full disclosure by witnesses, preventing those under investigation from fleeing or tampering with grand jurors, and protecting the innocent from unwarranted prosecution and reputational damage, among other reasons. Typically, a violation of Rule 6(e) is treated as an obstruction of justice and is prosecutable under 18 U.S.C. § 1503.

39.     With only limited exceptions, evidence presented to, and the deliberations of, the grand jury are strictly confidential.  Unauthorized disclosure of secret grand jury information is punishable as a felony with a prison sentence of up to five years.  If the leaker is employed by the USAO or FBI, that law enforcement official is also subject to criminal contempt, investigation by the DOJ's Offices of Professional Responsibility (if a DOJ attorney) and/or

92101-00002/3876779.18

Inspector General or by the FBI's Office of Professional Responsibility (if an FBI employee),

and the imposition of administrative discipline, including potential termination.  The leaker, if an

attorney, also is subject to discipline by the bar, including license suspension or disbarment, for

such unethical and unlawful conduct.

40.     In the event of any leaking of grand jury information to the media or anyone else,

the USAO is obligated to investigate promptly and thoroughly to determine the source of the

leaks and prevent future unauthorized disclosures.  This is not a discretionary obligation.  The

viability of the grand jury process—and the public's confidence in its deliberations—mandate

that wrongdoers be identified and prosecuted.

**A Stalled Investigation Prompts an Unlawful Campaign to Violate Walters' Rights.**

41.     The Government began to target Walters for investigation as early as November

4, 2011.  In the early stages, the investigation pertained to certain stock purchases and allegations

of insider trading involving Clorox stock, investor Carl Icahn, and Walters.  At or around that

time, the Government obtained the first in a series of pen registers and "trap and trace" devices

for Walters' phone to capture phone numbers for all incoming and outgoing calls.

42.     After several years, however, the Government's investigation had grown cold,

with no evidence of wrongdoing by Walters.  Chaves, the then-FBI Supervisory Special Agent

("SSA") in charge of the investigation, would later admit that the investigation was "dormant."

43.     The USAO then broadened the investigation to include suspected insider trading

of Dean Foods stock, Dean Foods chairman Tom Davis, professional golfer Phil Mickelson, and

Walters.

44.     It was at this time in the spring of 2013 that Chaves embarked on a calculated,

deliberate, and sustained campaign of illegal and criminal leaks to both *The New York Times* and

*The Wall Street Journal* in an attempt to resuscitate the "dormant" investigation.

45.     In April 2013, Chaves arranged a dinner meeting with *Times* reporters Matthew

Goldstein and Ben Protess to illegally divulge confidential information about the Walters

investigation and the grand jury.  Chaves then met with reporter Susan Pulliam of *The Wall*

*Street Journal* and informed her that the FBI was investigating Walters.  To this day, Walters

does not know whether this was the first such meeting, or if Chaves and the other Defendants'

conspiracy to violate his rights had begun even earlier.[1]

46.     The purpose of the media disclosures was, at least in part, to establish a *quid pro*

*quo* whereby Chaves would provide confidential investigative information for the reporters to

use in stories, while the reporters would, in turn, provide investigative leads.  Chaves specifically

asked the reporters to notify him if they came across information regarding Walters.

47.     This *quid pro quo* was ultimately consummated.  For example, Pulliam would call

Chaves from time to time to describe what she had learned about Walters.  Chaves, for his part,

not only discussed confidential details of the investigation, but he also would at times indicate to

reporters when *their* sources had turned up false or incorrect information.

48.     Another purpose of the leaking was to obtain incriminating evidence that Walters

was engaging in insider trading.  The Government had secured court authorization to tap Walters'

phone.  Chaves hoped that the publication of leaked information about the investigation would

"tickle the wire" by causing associates or the media to call Walters to elicit incriminating

statements.  But months of electronic surveillance yielded nothing.

49.     The pattern of leaking that Chaves engaged in during this period was staggering,

---

[1] As alleged throughout this Complaint, the government officials sued here have engaged in a
deliberate coverup, and Walters still lacks critical information about the full scope of their
wrongdoing.  Most of the facts alleged here were uncovered years after the deeds in question.

and its full scope is still not known.

50.     In mid-April 2014, Chaves dined with three reporters from *The New York Times* and leaked additional details about the investigation, telling the *Times* reporters about specific securities trades the FBI was purportedly investigating.

51.     Text messages and phone logs indicate multiple calls between Chaves and *The Times'* Ben Protess, including an approximately 21-minute call on April 20, 2014.  The sheer magnitude of the Defendants' cover-up is illustrated by the fact that the content of those text messages and phone calls—and all other confidential information Chaves illegally conveyed to the press—remains unknown outside the DOJ and the recipients.

### The FBI and USAO Learn of the Leaks Almost Immediately.

52.     One of the most stupefying facts about this wholesale breach of the confidentiality of information in the Walters investigation is that it could have been easily prevented if Bharara, Zabel, Kasulis, or Venizelos had honored their legal responsibilities.  Each defendant knew almost *a month before* the first leaked story appeared that a *Wall Street Journal* reporter was receiving confidential information about the investigation.  And they had to know that Chaves was a likely suspect, since Defendants also knew, or should have known, that Chaves had previously leaked confidential investigative information to the media.  *See* ¶ 130, *infra*.  Yet, not only did these Defendants do nothing, not interrogate Chaves, and not remove him from the investigation, they actually cooperated with journalists from *The New York Times* and *The Wall Street Journal*, thereby facilitating the deluge of ensuing leaks that benefited the prosecutors.  It is difficult to reach any conclusion other than that these Defendants willfully turned a blind eye to Chaves' illegal conduct.

53.     On May 6, 2014, J. Peter Donald, the FBI's New York Field Office media

representative, invited Chaves to a coffee meeting with Susan Pulliam of *The Wall Street Journal*.  At that meeting, the three discussed the Walters investigation (which, at that point, was still supposed to be confidential).  Donald would later recall that Pulliam already had a high level of detailed knowledge about the investigation, including specific information about the subjects and securities involved.  Chaves had previously given Pulliam this information.

54.     While Donald denied that he or the FBI knew at that time that Chaves was the source of the leaks, the decision to invite Chaves (and only Chaves) to the meeting with the reporter strongly suggests otherwise.  Why Chaves and not the other Special Agent Matthew Thoresen or the ADC Venizelos?

55.     Chaves would later admit that, at this meeting, he and Donald (illegally) confirmed the scope of the Walters investigation.  After Pulliam revealed that she intended to publish an article about the investigation, Donald asked her to wait to allow the USAO to discuss it first internally.  Given their cozy relationship, Pulliam agreed.

56.     After that coffee meeting, the FBI alerted the USAO to the discussion with Pulliam and the impending article about the investigation.  At this point, *more than three weeks before the first article*, both the FBI and the USAO were put on notice that someone had leaked confidential grand jury information about the Walters investigation to the media.  But no internal investigation was conducted.  No one seemed interested in addressing the Government's own illegal activity.

57.     On May 13, 2014, a week after the coffee meeting with Pulliam, the FBI's Donald called *The Wall Street Journal* and persuaded the newspaper to hold its story about the investigation until May 22, 2014.  The FBI had become an extension of *The Journal*'s newsroom — "stop the presses!"

-16-

58.     According to after-the-fact testimony by AUSA Kasulis, the FBI throughout this period kept the USAO apprised of its ongoing communications with *The Journal*.  Walters has so far been denied access to the internal communications between Bharara, Zabel, and others.  But we know one thing for certain: they did nothing meaningful to derail the story and stop the leaks.  Why?  Because the orchestrated leaking during the ongoing wiretap advanced the "dormant" Walters investigation—something the other Defendants surely wanted.

59.     On May 22 and 23, 2014, *The Journal* asked to meet again with the FBI to discuss its upcoming story on the Walters investigation.  The FBI and the USAO internally discussed whether to take the meeting.  The details of that discussion also remain concealed, but the result is that the meeting took place between several FBI agents (including Chaves) and *Journal* staffers.  This meeting never should have happened because no legitimate public interest would be served.  The fact that Bharara, Zabel, Venizelos, and Kasulis—all of whom knew what was happening—allowed this meeting to occur provides damning evidence that they were now part of the plot to take down Walters through an orchestrated, unlawful campaign by federal law enforcement using two of the leading newspapers in America.  Any one of these four defendants had the authority—and duty—to prohibit any Government employee from attending a meeting that was preceded by, and proved to involve, the illegal disclosure of confidential information.

60.     Five members of the FBI agreed to meet with Pulliam, Michael Rothfeld, and an editor from *The Wall Street Journal* on Tuesday, May 27, 2014.  Those individuals included Chaves.[2]

---

[2] In addition to Defendant Chaves and New York Field Office media representative Donald, the other three FBI personnel who attended the May 27th meeting with the *Journal* were: Assistant Special Agent in Charge Douglas Leff (who was Chaves's direct supervisor), Special Agent in Charge of the New York Field Office Criminal Division Richard Frenkel, and Supervisory Special Agent Christos Santos (who led the New York Field Office's media program).

61.     A full account of this meeting has never been disclosed, and the FBI members in attendance gave conflicting accounts of all that transpired.  What is known, however, is that multiple FBI agents in attendance confirmed various aspects of the investigation, including a discussion of surveillance techniques used by the FBI.

62.     The meeting was an integral part of the FBI's ongoing *quid pro quo* with the media.  In exchange for the valuable, confidential information obtained at that meeting, *The Journal* continued to hold its story.  Incredibly, the Government agents at the meeting promised to tip off the *Journal* if the FBI learned that a competing news organization was working on a similar story about the investigation.

63.     The evening after the meeting with *The Journal*, Chaves informed his supervisor that *The New York Times* also was inquiring about the confidential investigation and was likewise preparing to publish a story.

64.     The FBI and the USAO continued to communicate about the planned news articles and immediately alerted *The Journal*.

65.     In internal emails, Chaves deceptively lamented the leaks, suggesting that the Bureau "just can't win," knowing full well that *he* was the source of the leaked information.  FBI Agent Matthew Thoresen responded: "Whomever is leaking apparently has a specific and aggressive agenda in that they are now going to other media outlets in an effort to derail this investigation."

66.     It was clear to the FBI Agents and USAO officials working the Walters investigation that there was a massive leaker in their midst.  It would have taken, and it did take only, miniscule investigative prowess to discover that it was Chaves.  But no one asked him!

**The FBI and USAO Accelerate Their Investigation In Coordination with the Media**.

67.     On May 29, 2014, after learning about the pending publicity regarding the investigation, the Chief Public Information Officer at the USAO (James Margolin) emailed six AUSAs, including Zabel and Kasulis, with an update about the USAO's contacts with the media. Now the USAO press officer—and not his FBI counterpart— was actively coordinating DOJ communications with the media and scheming with his colleagues.

68.     The same day, Zabel responded that he, too, had been contacted by *The Journal* and confirmed that the newspaper had detailed, confidential information about the Walters investigation.  Zabel's email, which is redacted in critical respects, indicates that he was aware at that time of at least the strong possibility, if not the fact, of a Government leak.

69.     In response, Margolin conveyed that the FBI felt it had an obligation to notify *The Wall Street Journal* about the anticipated *Times* story, while the Bureau was concurrently approaching the targets of the investigation in advance of the anticipated publicity.

70.     The following day, May 29, 2014, the FBI approached two subjects of the investigation.  Agents met with Tom Davis, Chair of Dean Foods, at his home in Texas and with Phil Mickelson at a golf tournament in Ohio.  Davis denied any wrongdoing and confirmed that he never gave insider information to Walters.  Likewise, Mickelson denied any wrongdoing.

**The Media Publishes Articles Divulging Confidential Information About the Investigation.**

71.     Shortly after learning that it might get scooped by *The Times*, *The Journal* broke the story on May 30, 2014, by reporting that "federal investigators are pursuing a major insider-trading probe involving finance, gambling and sports."

72.     The article was headlined "*FBI, SEC Probe Trading of Carl Icahn, Billy Walters,*

*Phil Mickelson; Insider Trading Investigation Began in 2011 with Unusual Trades in Clorox*."  It repeatedly referred to unidentified sources who were familiar with the investigation, and provided detailed information concerning the investigations into stock trading involving both Dean Foods and Clorox.  The following passages revealed key details of the ongoing investigation:

a.  "Federal investigators are pursuing a major insider-trading probe involving finance, gambling and sports, examining the trading of investor Carl Icahn, golfer Phil Mickelson and Las Vegas bettor William "Billy" Walters.  The Federal Bureau of Investigation and the Securities and Exchange Commission are examining whether Mr. Mickelson and Mr. Walters traded illicitly on nonpublic information from Mr. Icahn about his investments in public companies, people briefed on the probe said."

b.  "The FBI and SEC are examining whether Mr. Walters on at least one occasion passed a tip on to Mr. Mickelson, these people said, and are studying the two men's trading patterns."

c.  "The government investigation began three years ago after Mr. Icahn accumulated a 9.1% stake in Clorox Co.  in February 2011, said the people briefed on the probe.  On July 15, 2011, he made a $10.2 billion offer for Clorox that caused the stock to jump.  Well-timed trading around the time of his bid caught the attention of investigators, who began digging into the suspicious trading in Clorox stock, the people familiar with the probe said."

d.  "The investigators expanded their probe to look at trading patterns by Mr.

-20-

Walters and Mr. Mickelson relating to Dean Foods Co., said the people

briefed on the probe.  The FBI, following its approach to Mr. Mickelson

on Thursday, expressed an interest in his trading in Dean Foods, a person

familiar with the situation said."

73.     Hours after *The Journal* article broke, Matthew Goldstein and Ben Protess wrote

a story that ran in *The New York Times* with substantially the same information (but specifically

highlighting the leading role that federal prosecutors in Manhattan were playing in the

investigation).  The article was headlined "*Investor, Bettor, Golfer: Insider Trading Inquiry*

*Includes Mickelson, Icahn and William T. Walters.*" It also revealed the length of the

investigation (which no one outside the Government could have known) and disclosed

information from telephone and trading records that were obtained using grand jury subpoenas.[3]

Relevant passages include:

a.      "Federal authorities, whose investigation has dragged on for more than

two years without yielding definitive evidence of insider trading, are also

examining phone records to see whether Mr. Walters spoke to Mr. Icahn

shortly before the trades."

b.       "In a separate strand of the investigation, federal authorities are looking

into trading in Dean Foods that has no apparent connection to Mr. Icahn,

---

[3] In this case, the Government conceded in the District Court that all information obtained pursuant to a grand jury subpoena, including the contents of documents, are subject to the secrecy provisions of Rule 6(e) of the Federal Rules of Criminal Procedure.  Accordingly, it is irrelevant that matters relating to Walters' case were not presented in the grand jury room until after the *Journal* and *Times* stories appeared.  What matters, and what the Government cannot successfully refute, is that the available evidence showed that at the very least the Government improperly disclosed the existence of grand jury subpoenas and certain other information gathered pursuant to those subpoenas to the press.

92101-00002/3876779.18

the people briefed on the matter said.  Mr. Walters and Mr. Mickelson

placed the trades around August 2012, according to the people, just before

the food and beverage company announced its quarterly earnings and a

public offering of stock for one of its subsidiaries.  The authorities are

investigating whether Mr. Walters had a source inside the company

itself— and whether others who know Mr. Walters may have traded on the

information as well."

74.    The media blitz continued during the next several days, with articles in *The Times*

on May 31, and in *The Journal* on June 2.  In addition to the many confidential details obtained

from the illegal leaks, the articles also provided a window into why the FBI and USAO were

leaking the information:

    a.    "A recounting of the government's tactics, described in interviews with

people briefed on the matter, provides a case study in the hurdles of

building an insider trading investigation. . . .  [A] case can wither without

a smoking-gun email, a loose-lipped cooperating witness or wiretapped

conversations.  In recent months, authorities have pored over phone

records, the people briefed on the matter said, . . . [b]ut phone records

provide only circumstantial leads."

    b.    "While the publicity is likely to damage the government's ability to

conduct covert surveillance, ***investigators can sometimes use publicity to

their advantage. After news reports, the subjects of investigations will

often discuss the reports or take actions to avoid being caught, and those

maneuvers can cause them to get caught***, law enforcement officials have

said." (Emphasis added.)

75.      Indeed, at the time these articles were appearing, the investigators had installed a live wiretap on Walters' phone that they hoped would capture exactly these kinds of incriminating statements.  For example, there was an immediate "tickle on the wire" in the form of calls to Walters' cell phone from *Journal* reporter Michael Rothfeld and *Times* reporter Matthew Goldstein.  Ultimately, Walters did not make any incriminating statements, and the Government never introduced any of the recordings at his trial.

76.      Details of this surveillance were disclosed in a *Wall Street Journal* article on June 1, 2014, headlined, "*Trade Probe Hits Snag as Surveillance is Derailed.*"  The story revealed that the reporters were briefed about the Government's earlier use of pen registers and other surveillance techniques.  The article stated:

   a.      "Authorities were considering the use of wiretaps in the investigation of the financier, gambler and golfer, people briefed on the probe said. Meantime, investigators were using other types of electronic and human surveillance in the probe, the people said.  ***In recent weeks, potentially promising surveillance through such methods had picked up in activity, the people said***."  (Emphasis added.)

   b.      "Even before the probe became public, investigators confronted roadblocks particular to the unusual nature of the people under scrutiny, according to the people briefed on the probe.  As they considered whether they could wiretap Mr. Icahn, one of the people said, they learned that it could be hard to do so without him finding out because he owned a stake in a telecommunications company through which surveillance might have

-23-

to be conducted."

**Defendants Knew of the Leaks But Did Nothing to Stop Them.**

77.     When the *Journal* article was published on May 30, FBI New York Field Office media representative Donald circulated it via email to others, including Venizelos.  Venizelos replied about an hour later to Donald and others (including Chaves), asking "[h]ow did [the reporter] find out about agent approaching PM [Phil Mickelson] on thursday [sic].  I don't buy that he [Mickelson] told them."  Venizelos instructed his staff to "not speak to this reporter again for now."

78.     Donald replied a few minutes later that the "WSJ told me that the defense attorney told them that agents had approached his client."  But that made no sense, as Venizelos pointed out in his response.  Venizelos vowed that if the FBI agents continued to leak "there [would] be reassignments immediately."  This kind of admonition was worthless.  What the FBI's senior official in the New York Field Office should immediately have done is launch a full-scale investigation with Chaves and anyone else knowledgeable about the investigation being interrogated under oath by trained internal affairs investigators.  Once again, however, nothing was done, and the leaks kept flowing and flowing and flowing.

79.     Perhaps most significantly, Venizelos confirmed to his subordinates that the case against Walters was doomed.  "If we don't have enough evidence by now its [sic] over," Venizelos wrote.  In other words, besides realizing that the leaks were being used to revive an investigation going nowhere, the senior-most FBI official in New York confirmed his clear understanding that one or more agents within his office were illegally leaking secrets to the media to jumpstart the investigation.

80.     Not only did Venizelos know that one of his own agents was leaking, but Bharara

and Zabel knew as well.

81.     Bharara and Zabel had contemporaneously seen all the articles.  Bharara sent Venizelos a link to the June 1 *Journal* article and made clear that they fully understood the source of the leaks came from within the DOJ.  Bharara conveniently condemned them: "I know you agree these leaks are outrageous and harmful.  Let me know what action you want to take together."

82.     Despite professing outrage at the leaks, the two highest DOJ officials in the Southern District of New York did absolutely nothing *for a full 30 months* to investigate and stop the flood of leaks.  All Venizelos did was email various FBI agents, including Chaves, stating the obvious—the leaking "is now an embarrassment to this office."

83.     The calculated unwillingness of Bharara and Venizelos to take any meaningful steps to stem the tide of illegal leaking is unconscionable—and unlawful. Under DOJ and FBI policies and procedures, this malicious Government misconduct should have been immediately halted and investigated.  Unquestionably, even the most casual interview of Chaves or review of his emails, texts, and phone records would have identified him as the culprit.

84.     While Venizelos' email of June 1, 2014, stated that "[w]e have issues to deal with and they will be address [sic] appropriately," all information that has come to light since confirms that neither the USAO nor the FBI did anything at this point to investigate or stop the leaks aside from issuing rote directives "not to speak to any of the reporters involved."

85.     In fact, on or about June 12, 2014, an "astonish[ed]" Zabel, in a damning email, reported to Bharara and others that Zabel had spoken with *Times* reporter Protess.  Zabel stated that Protess "was quite upset" that *The Times* had to issue corrections to his stories about the investigation and "blame[d] an FBI person (and it sounds like an agent) whom he [says] they

-25-

have confirmed lied to the NYT and some other news orgs." So, not content to leak accurate information about the Walters probe, Chaves—in his zeal to get Walters—engaged in a disinformation scheme by lying about the investigation.

86.     According to Zabel, Protess disclosed that his FBI source "did not like being called out for lying or the story being walked back and was a bit threatening saying Ben [Protess] and the NYT are 'on the radar.'" Yet notwithstanding this confirmation that someone within the Department of Justice was leaking false narratives and ***had even threatened The Times with retribution***, Zabel recommended: "I don't think this should be discussed generally right now for a number of reasons but obviously we need to discuss and will need to address this with the FBI."

87.     Bharara and Zabel, therefore, had notice no later than June 12, 2014, that the FBI was engaged in a pervasive campaign of leaking—and even threatening journalists—relating to the investigation into Walters and others. But Zabel's conclusion—in which Bharara acquiesced—was that nothing should be done (aside from discussing with the FBI at some unspecified later date) and the matter should be kept under wraps. We now know that one of those numerous "reasons" was the USAO's desire, endorsed by these two most senior officials, that the conspiracy within the FBI and DOJ to manipulate the media continue in order to aid the Walters investigation. No legitimate "reason" existed for failing to immediately interdict this blatant illegality. The inexplicable inaction by Bharara and Zabel made them knowing and willing accomplices in this sordid affair every day that it persisted. Official DOJ endorsement of the violation of Walters' constitutional right to a fair, just, and impartial investigative process cannot go unaddressed.

88.     In the absence of any meaningful effort by Venizelos, Bharara, Zabel, and Kasulis

to halt the leaking, Chaves was emboldened and continued to unabashedly share confidential grand jury information with his media contacts.

89.     Realizing the increased awareness within the DOJ and the FBI about his activities, Chaves switched to a personal cellphone to conduct and conceal his illegal operations. Chaves would later admit that he spoke with *The Times* reporters on his personal cellphone, on or about sometime between June 2 and June 11, 2014.

90.     Chaves also admitted that, around that same time, he deleted a personal email account, in an effort to cover up his communications with *The Times* reporters.

91.     On June 10, 2014, the FBI approached Walters for the first time, but he declined to speak with them.  The very next day, *The New York Times* ran another story that contained new details about the investigation, including the specific dollar amounts that Walters allegedly earned in the stock trades under scrutiny.  The timing of the article—one day after Walters invoked his constitutional right to counsel and declined to speak to the Government without his attorney present—further illustrates the Department's use of the media as a weapon against an investigative target.

92.     There can be no doubt that Bharara, Zabel, Kasulis, and Venizelos knew that an FBI agent was the leaker.  In a telephone conversation on July 15, 2014, Walters' attorneys Jim Sanders and Richard Wright complained to Kasulis and AUSA Matthew Schwartz about the leaks of confidential information.  The response by the Government's lawyers was stunning. Kasulis did not object when Sanders told them that certain documents being produced by Walters would be delivered only to the AUSAs and not the FBI.  When Walters' lawyers pressed them about what the DOJ was doing to halt the outrageous leaking, Kasulis replied: "We completely hear what you are saying.  We take very seriously the coverage in the press.  We'll take all

-27-

precautions we believe are appropriate."

93.     In fact, Kasulis was merely spouting the party line.  No "precautions" had been or would be taken despite the fact that Kasulis worked regularly with Chaves.  This inaction was far worse than studied indifference—it constituted a conscious and deliberate strategy by Venizelos, Kasulis, Bharara, Zabel and associates to enable the corrupt FBI agent to continue in hopes that his criminal conduct would bear fruit.  Indeed, each time an article appeared, Bharara and company had another opportunity to investigate and interdict the damaging leaks.  Yet, like a flock of ostriches, they put their heads back in the sand.

94.     All told, *The New York Times* published five articles between May 30 and June 23, 2014, revealing confidential details of the investigation.  *The Wall Street Journal* published eight articles between May 30 and August 12, 2015.  All of the above occurred while Defendants either actively participated in the illegal leaking or deliberately turned a blind eye to it.

**The Defendants Continue Their Cover-Up In District Court.**

95.     Walters was ultimately indicted on insider trading charges in May 2016 in the Southern District of New York.  After his indictment, Walters brought the high likelihood of illegal leaking by DOJ personnel to the District Court's attention.  On September 23, 2016, he filed a motion requesting a hearing to address possible Government misconduct relating to the leaks in the 13 articles.

96.     On October 21, 2016, the USAO filed an opposition in which it adamantly denied what it knew to be true for years: one or more Government agents were the source of the leaks. In this memorandum, approved by Bharara, Zabel, and Kasulis and submitted by Goldman and others, the USAO denied the allegations and deceived the District Court by arguing that Walters' claims were "baseless accusations [] undermined by the facts" and that "the source was not a

Government official." The DOJ derided a request by Walters' attorneys for an evidentiary hearing as "a fishing expedition," claiming unequivocally that there was no leak of grand jury information by a Government source.

97.     Kasulis submitted a declaration, under oath, stating that neither he nor the case agent leading the investigation day-to-day was the source of the leaks. But he conveniently neglected to disclose to the District Court that, at least more than two years earlier, each of the Defendants had full knowledge and had been told expressly that someone within the DOJ (specifically, an FBI agent) was a source of the leaks.

98.     Indeed, in his declaration, Kasulis claimed that "[o]n or about May 13, 2014, the USAO learned from the FBI press office that *The Wall Street Journal* **would not be able to publish a story about our investigation until May 22, 2014** at the earliest, and that it might well be later [emphasis added]." To the contrary, Kasulis (and the other Defendants) knew full well that the real reason *The Journal* "would not be able" or "would not be prepared" to publish its story until May 22, 2014, was because the DOJ had specifically asked for a delay. The *Journal* **agreed** to the request following a meeting and phone call with the FBI—facts that the senior leadership of the USAO, including Kasulis, conveniently concealed from the court.

99.     In short, through these material omissions, the USAO blatantly lied in a court filing and misled the trial judge in an effort to shut down any judicial inquiry into their deliberate failure (along with Venizelos) to investigate and stop the leaks from their inception.

100.    On November 17, 2016, U.S. District Judge P. Kevin Castel ordered an evidentiary hearing into the alleged leaking by the FBI and/or USAO, finding that the newspaper articles in question were at the very least "suggestive of a government leak."

101.    It was **only after** the District Court ordered this evidentiary hearing that the

92101-00002/3876779.18

USAO finally acknowledged what it knew all along: there was at least one leaker in their midst.

102.     Defendants desperately wanted to avoid an evidentiary hearing that would expose their connivance and deliberate decision not to investigate or plug the leaks.  They also wanted to avoid having to produce some 2,000–3,000 documents (including a massive number of emails and text messages) and to present testimony of key participants whose misconduct would become evident.  So, they concocted a clever (and fraudulent) scheme to hide their wrongdoing.

103.     Defendants sought to cover up their cover-up.  On December 16, 2016, the USAO wrote two letters to Judge Castel.  In one letter, approved by Bharara, Zabel, and Kasulis, submitted by Goldman and others, ***but not furnished to Walters' counsel***, the USAO made an *ex parte* submission to the Court under seal.  The document was an 11-page report setting forth a description of its investigation and findings; it included the contents of only seven self-serving emails (out of more than 2,000) referenced in the letter.

104.     In a second letter of the same date, also approved by Bharara, Zabel, and Kasulis, submitted by Goldman and others, and furnished to Walters' counsel, the USAO gave a very cursory report on its "investigation" devoid of any details and evidence.  More significantly, the USAO asked the District Court to review *in camera*—and withhold from Walters' counsel— the 11-page report in its other December 16th letter.  But it got worse.  Incredibly, the Government also urged Judge Castel not to proceed with the scheduled evidentiary hearing, but to instead hear any evidence "*ex parte* and *in camera*," meaning without Walters' counsel participating, ever learning about the evidence presented, or cross-examining the witnesses.  In short, if the Government had its way, the victim of this conspiracy would never learn the truth.

105.     Walters vigorously opposed the USAO's attempt to stonewall any credible judicial inquiry into the Government's misconduct.  In a December 18th reply, approved by

Bharara, Zabel, and Kasulis and submitted by Goldman and others, the USAO—by now beyond desperate to block Walters' access to the detailed report given to Judge Castel and to avert a public evidentiary hearing—scoffed at Walters' demand for elementary due process. The prosecutors had the gall to accuse Walters of seeking "a discovery windfall allowing [him] to cross-examine personnel in advance of trial . . . ." Apparently unaware of the irony, the USAO expressed concern that allowing Walters—the target of one of the most massive breaches of grand jury secrecy in history—to find out what the Government told the trial judge "would risk undermining grand jury secrecy . . . ."

106. On December 19th, Judge Castel denied the USAO's request and ordered that Walters receive access to the full report with limited redactions. Bharara's letter contained stunning revelations about the magnitude of Government misconduct—both the leaking and cover-up.

107. Without explaining his position two months earlier denying a Government source—Bharara admitted that *"[i]t is now an incontrovertible fact that FBI leaks occurred, and that such leaks resulted in confidential law enforcement information about the Investigation being given to reporters*."

108. Bharara's letter stated that Chaves had admitted to the leaks on December 6, 2016. Bharara claimed that Chaves and his admission of gross misconduct had been referred by the FBI to its Office of Professional Responsibility and by the USAO to the DOJ's Office of Inspector General.

109. Bharara's letter contained no explanation about what, if any, investigation Defendants had conducted into the source of the leaks between the time they first learned of them in May 2014 and this sudden revelation in late 2016. The reason is obvious: they had done

absolutely nothing.

110.    Bharara claimed that, in light of the Court's order to respond to the leaking

allegations, the DOJ had "collected and reviewed thousands of emails and text messages, and

records of phone calls" and conducted more than a dozen interviews.  As part of his cover-up,

however, Bharara produced to Walters and the district court *only seven* self-serving emails and

zero interview memos or notes.

111.    The bombshell revelation in the Bharara letter was clear: the FBI and the USAO

had engaged in a pervasive campaign of leaking secret grand jury information to their media

contacts and then covered it up for more than two years. It was only disclosed when a federal

court agreed with Walters' request for a hearing to address the Government's wanton

misconduct.

## The District Court and the Court of Appeals Condemn the Illegal Actions of Defendant Chaves, But Provide No Remedy.

112.    Walters sought to have his indictment dismissed and conviction overturned based

upon Defendants' illegal conduct.  While the conviction was ultimately upheld, both the District

Court for the Southern District of New York and the Second Circuit Court of Appeals

condemned the illegal actions of Defendant Chaves.

113.    In a hearing on December 21, 2016, after the illegal Government leaks came to

light, District Judge Castel candidly admitted:

> "*I wasn't cynical enough to think that I was going to learn of deliberate*
>
> *disclosures by a special agent of the FBI and deliberate disclosures after the*
>
> *fact of leaks became known within the bureau and the U.S. Attorney's Office*
>
> and a warning, a strongly-worded warning, was issued by a person within the

bureau in a supervisory capacity.  Human nature being what it is, I could certainly

understand if an agent found themselves in communication with a member of the

press and somehow a conversation got out of hand and went beyond where it

should have, and the agent, without any real thought ahead of time, misspoke.

That is not what happened here.  This included dinner meetings and the like.  ***I am

a wiser person today for having been exposed to this.  To say I was shocked

would be an accurate statement.***" (Emphasis added.)

114.     During the hearing, Judge Castel expressed his deep skepticism about the

Government's lack of candor.  He concluded the hearing by cautioning that no one should "brush

. . . under the carpet" what might be the USAO's "willful blindness" "where an office doesn't

press too hard because they would prefer not to create friction with an agency that is so

important to the success of the office."

115.     The Government's counsel made several telling concessions.  Echoing Kasulis'

perfunctory statement to Walters' counsel *more than two years earlier*, the USAO's lawyer, Joan

M. Loughnane, admitted: "I hope that it is clear to the Court from our submissions that we take

this very, very seriously.  The leaks that we've reported should have never happened.

*Uncharged allegations like this should not be aired in the press*; and they interfere with

investigations, as they did here."  (Emphasis added.)

116.     Loughnane also conceded an issue at the heart of Walters' lawsuit: "I certainly

wish that we had done a better job discovering what happened back in 2014."

117.     Walters' attorney challenged Loughnane's claim that the USAO was blameless by

noting to the court that there was no investigation or fact-finding effort to "identify who is

responsible, do they have a rogue agent, do they have rogue agents, is this a pattern or practice?

Apparently nothing." Counsel offered a compelling motive for why the USAO and FBI decided not to investigate: the media could help the Government build a case against Walters that was all but dead. The FBI "didn't want to find out, they didn't try to find out, knew it was to be done to help their case . . . ."

118.    At the hearing, Walters' lawyer also pointed out the inherent defect in the USAO's belated, so-called investigation as reported in its letter to the Court: they had a glaring conflict of interest in "investigating their own colleagues, their own bosses. They interviewed the U.S. Attorney himself. They are interviewing FBI agents who bring cases to them . . . . These are people they work with. They can't do that. *They are self-interested because they have culpability potentially as well. They could be criticized for not uncovering this sooner, for . . . turning a blind eye. . . .* [T]here's no basis to trust their recitation of fact-finding in this case." (Emphasis added.)

119.    Judge Castel referred the matter to the USAO to review for possible prosecution for criminal contempt and/or obstruction of justice. Judge Castel even noted that, because members of the USAO may be "fact witnesses to aspects of" the illegal leaking, the USAO could refer the matter to an independent office or agency to investigate.

120.    Instead of referring the matter to an independent investigator, the FBI on December 8, 2016 referred Chaves' conduct to OPR, the internal division within the FBI responsible for investigating allegations of misconduct. On December 15, 2016, the USAO referred Chaves' conduct to the OIG, an investigative body within the DOJ that conducts full-fledged criminal investigations into the conduct of DOJ employees. On or about December 20, 2016, the OIG opened a criminal investigation into the leaks at issue here, including but not limited to Chaves conduct. Supposedly, DOJ's Public Integrity Section ("PIN") would oversee

the OIG investigation.  All in all, no fewer than three governmental units were charged with investigating Chaves' admitted crimes.

121.    To no one's surprise, no known punishment has come from these internal investigations.  Neither Walters nor the public knows the nature of the supposed criminal investigation, the outcome, or the reasons for taking no action after Chaves confessed.  Nor is there any public reporting of whether Chaves was disciplined in any manner for his admitted wrongdoing.  His retirement with full benefits in 2017 strongly suggests that he got away scot-free.  Once again, DOJ's iron curtain descended on this entire shocking episode, in a manner consistent with DOJ's history of lack of transparency and accountability when it comes to disciplining its own employees.

122.    Judge Castel also requested quarterly updates on the status of the investigations into Chaves and the illegal leaks.  While it appears that such quarterly reports were provided to the District Court (but only until September 13, 2019), their substantive content was wholly redacted at DOJ's insistence, thereby foreclosing any public scrutiny or accountability.  Thus, Walters has no idea what further misconduct may have been uncovered as a result of this court-ordered investigation or the results of the multiple probes.[4]

123.    In an Order dated March 1, 2017, denying Walters's motion to dismiss the indictment for Government misconduct, Judge Castel found that misconduct had occurred.  Judge Castel concluded that Chaves had violated Rule 6(e) by illegally leaking grand jury information to the media.  He further noted that "the government's artful opposition" to Walters'

---

[4] When DOJ requested that it submit its quarterly reports *ex parte* and under seal on March 11, 2017, it argued that "[t]he criminal investigation [of Chaves] remains active, and public disclosure would hinder it."  That justification evaporates *three and one-half years later, especially since Chaves was never indicted.*

request for a hearing into the alleged leaks was misleading, at least to the extent "it confined itself to denials from limited sources and never disclosed high-level concerns over FBI leaks."

124.    In its decision on December 4, 2018, the Second Circuit Court of Appeals also acknowledged that **Chaves' conduct "was highly improper."**  The Court explained: "The leaking of confidential grand jury information to members of the press, whether to satisfy public interest in high profile criminal prosecutions or to generate evidentiary leads, is **serious misconduct and, indeed, likely criminal."** (emphasis added).

125.    Despite the clear illegality of Chaves' conduct and the concerted efforts by the other Defendants to cover up his misdeeds, the Court of Appeals agreed with Judge Castel and concluded that the misconduct was not prejudicial to Walters and declined to overturn his conviction.  In so deciding, the appellate panel acknowledged that "Chaves's misconduct is deeply troubling, and the decision to forgo a[n evidentiary] hearing prevents us from understanding if there were other cases like this one."

126.    In declining to overturn the conviction of Walters, however, the Court of Appeals in no way precluded a determination that Chaves' unlawful conduct, and the actions of the other Defendants in concealing it, violated Walters' due process rights, including his right to a fair, just and impartial investigation, grand jury proceeding, and trial.[5]

127.    In a concurring opinion, Senior Circuit Judge Dennis Jacobs poignantly observed: "The arresting feature of this case is that the supervisor of the FBI investigation [Chaves] was likewise involved in the illegal leaking of confidential information; and **the leak of grand jury testimony is in some respects more egregious than anything Walters did**. . . . [W]ithout a

---

[5] It was not until the Second Circuit issued its decision in December 2018, however, that it became clear that Walters would have no alternative remedy other than the instant *Bivens* action, thereby tolling the statute of limitations until Walters' appeals were exhausted.

hearing, ***it is unknown how far or where the abuse reached***.  The FBI depends on the confidence of the public, jurors and judges.  That confidence is critical to its mission; so this kind of thing is very bad for business."  (Emphasis added.)

### Chaves Suffers No Consequences For His Illegal Leaking.

128.    Chaves broke the law.  After hiding in plain sight for more than two years, he admitted it in December 2016.[6]  But despite nominally being "investigated" by the Department of Justice, he has never been prosecuted, cited for contempt, or otherwise disciplined for his admitted crimes.  Quite the opposite—Chaves was actually *promoted* by the FBI in 2014 to become the head of all white-collar FBI investigations in New York, and he has since retired in 2017—with full benefits.  Chaves now enjoys a lucrative position as a Securities Fraud Program Manager on Wall Street and a paid speaker who discusses his successes at the FBI, *including the Walters' prosecution!*  Presumably, the paid speaking appearances do not include any reference to his admitted unlawful leaking of secret grand jury information.

129.    To put it simply, Chaves has profited handsomely from his flagrant violations of the law and his ethical obligations.  Make no mistake: his illegal treatment of Walters was just the tip of the iceberg in a career built on widespread and sustained disregard for the law.

130.    Chaves has been implicated in at least a half dozen reported instances of witness tampering, grand jury leaks, and other illegal and unconstitutional conduct during his time in the FBI's New York Field Office and during the tenure of the other Defendants.  Each of the below cases involved leaks of confidential information and other misconduct directly under Chaves' watch as a senior white-collar investigator in the New York FBI Field Office.  These include:

---

[6] After confessing to the unlawful leaks, Chaves asserted his Fifth Amendment rights against self-incrimination and refused to further cooperate.

a.  Raj Rajaratnam (2009): In May 2010, the DOJ and the SEC "opened
inquiries" into leaks regarding the investigation of Raj Rajaratnam, the
founder of Galleon Group.  The officials responsible leaked "the names of
unindicted co-conspirators to the news media, including to the *Wall Street
Journal*" in 2009.  To date, no disciplinary action has been taken regarding
the leaks, and Rajaratnam received a 12-year prison sentence.

b.  David Ganek/Level Global (2010): On February 26, 2015, David Ganek
sued **Bharara, Chaves** and other DOJ personnel for leaking information
to the press and fabricating evidence in late 2010. Among other things, the
complaint alleges that the DOJ leaked news of its impending raid of Level
Global's office to the media, which then photographed the FBI removing
boxes from the office.  Ganek was never charged with a crime, but his
hedge-fund business was destroyed.

c.  Fayad Abbassi (2011): In 2011, staff writers Susan Pulliam, Michael
Rothfeld, and Jenny Strasburg of *The Wall Street Journal* (two of whom
were the authors of the *Journal* articles discussing Walters) revealed that a
young analyst named Fayad Abbassi "of Neuberger Berman [was] among
those against whom investigators [were] pursuing charges, according to
people familiar with the matter" and provided details of those purported
forthcoming charges.  Abbassi was never charged, but he was immediately
placed on leave from his job following the leak.

d.  Michael Steinberg (2013): In 2013, staff writers Michael Rothfeld and
Jenny Strasburg of the *Wall Street Journal* again publicized details of the

-38-

Government's investigation of Michael Steinberg, including that "[a]uthorities [were] currently [] preparing to present evidence to a grand jury." Later, Strasburg was tipped off regarding the return of the grand jury indictment and was outside Steinberg's apartment when he was arrested at 6 a.m., which she captured on film. The Government ultimately dismissed all charges against Steinberg, but not until it had dragged him through a lengthy trial.

e.    Mark Nordlicht/Platinum Partners (2016): Throughout the second half of 2016, a series of false and inflammatory stories indicating, among other things, that Platinum Partners may be a Ponzi scheme and that its founder, Mark Nordlicht, was under investigation for securities fraud, appeared in the press. In that case, the DOJ admitted that **Chaves** was involved in the investigation and released emails showing that a reporter received a tip on the morning of a raid of Platinum's office. Nordlicht remains under indictment.

f.    Sanjay Valvani (2016): In April 2016, *The Wall Street Journal* revealed that Sanjay Valvani was the target of an insider-trading investigation. Following publication of the article, Valvani was placed on paid administrative leave—not because his employer believed that he did anything wrong but because the article identifying him as the target of the criminal investigation made it too difficult for him to do his job. The leaked information and ensuing media stories instantly decimated Valvani's reputation and his theretofore unblemished and highly

-39-

successful 15 plus-year career in the securities industry.  Valvani was

subsequently indicted, and days later tragically took his own life, never

wavering from the assertion of his innocence.

131.    The common denominator in these cases is that Chaves' breathtaking lawlessness

occurred on Bharara's watch.  Bharara was utterly derelict in his duty to police his police,

thereby encouraging systematic violations of citizens' constitutional rights to due process and

fairness.  Unlawful conduct by his FBI investigators—leading to high-profile white-collar crime

convictions—served Bharara's personal agenda to be seen as a "crime buster" when he should

have been a justice seeker.

132.    Chaves was never reprimanded, disciplined, or otherwise held accountable for his

pattern and practice of lawlessness in pursuit of another notch in his belt.

133.    Defendants Bharara, Zabel, Kasulis, and Venizelos knew about Chaves' illegal

investigative techniques, but they did nothing to stop him.  And why should they?  When Chaves

developed a case that led to convicting a suspect, all of them benefited.

### Bharara's Alliance with the Media Allowed Leaks to Flow Like Water.

134.    During his tenure as U.S. Attorney for the Southern District of New York,

Bharara (with hundreds of thousands of Twitter followers, now up to 1.5 million) made a name

for himself as a crusading prosecutor who craved media attention.  Journalists who covered

Bharara reported how he used the media to showcase investigations and elevate his own personal

profile. Brooklyn journalist Ross Barkan wrote that Bharara's "pursuit of justice has a

showman's quality, like it's just a preamble to run for higher office."  Ross Barkan, "Who holds

Preet Bharara accountable?" City & State New York, May 10, 2016

(https://www.cityandstateny.com/articles/opinion/who-holds-preet-bharara-accountable.html).

Reporter John Banks-Brooks wrote about his first-hand knowledge of Bharara's tactics:

> We came to expect that the Southern District's Preet Bharara
> would hold a ***splashy press conference*** to claim his latest scalp,
> and the media and the public ate it up, ***making Bharara a minor
> celebrity***.  But it was not simple vanity that, then and now,
> motivated prosecutors; it is his well-honed legacy of media
> strategy: dragging prominent and wealthy financial industry-types
> before the cameras has a funny way of pressing them to plea
> bargain."

John Banks-Brooks, "Feds' culture of leaks hurts private individuals too," TheHill.com (August 2, 2017), available at https://thehill.com/blogs/pundits-blog/homeland-security/344994-feds-culture-of-leaks-hurts-private-individuals-too (emphasis added).

135.    Renowned legal ethics expert Stephen Gillers, a professor at New York University Law School, has expressed concern that Bharara—with his preoccupation with publicity in announcing indictments—used his public office to gain personal attention.

136.    Bharara was admonished by a District Court for his unrelenting pursuit of media coverage in a case involving allegations of fraud, conspiracy and extortion against then-Speaker of the New York Assembly, Sheldon Silver.  Before Silver was indicted, Bharara held a press conference (described as a "media extravaganza"), issued a press release, tweeted about Silver, delivered a highly publicized speech at New York Law School, *and* gave an interview to MSNBC. The court observed that Bharara's comments about the case "strayed so close to the edge of the rules governing his own conduct that defendant Sheldon Silver has a nonfrivolous argument that he fell over the edge to the defendant's prejudice."  *United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2015).

137.    Other federal judges in New York became increasingly alarmed by Bharara's use of the media to advance his own agenda. Judge Richard J. Sullivan—a former AUSA who was appointed to the trial bench by President George W. Bush and is now serving on the U.S. Court

of Appeals for the Second Circuit—remarked in 2013 that press releases from Bharara's office had assumed a "tabloid" tone.

138.   *The Wall Street Journal* reported on a longstanding "pattern of troubling behavior and a problematic culture inside Mr. Bharara's old shop" regarding prosecutorial overreach, illegal leaks, and the use of the media as a tool of investigators.

139.   Bharara himself has opined on the subject in his own memoir: "False allegations, wrongful convictions, excessive punishments, miscarriages of justice are often wholly the result of human failings, not flaws in the impersonal machinery of justice."  Preet Bharara, *Doing Justice: A Prosecutor's Thoughts on Crime, Punishment, and the Rule of Law* (2019). It is Bharara's conspicuous failing as the U.S. Attorney for the Southern District of New York that allowed the culture of illegal leaking and unconstitutional investigations—that also ensnared Walters—to fester unchecked for years.

### A Fish Rots From The Head Down.

140.   The DOJ's egregiously unconstitutional treatment of Walters was hardly an isolated incident limited to the Southern District of New York for a finite period of time.  For at least the past decade, DOJ—and particularly the once-vaunted FBI—have engaged in systemic lawlessness that wantonly tramples on citizens' civil rights, makes a mockery of the Constitution's fundamental guarantees of fairness in enforcing the laws, and has gone largely unchecked by the courts and Congress.  Never have the words of Supreme Court Justice (and former Attorney General) Robert H. Jackson been more prescient:

> "The prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous.... While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst."

Remarks by Attorney General Jackson, *reprinted in* 24 J. Amer. Jud. Soc. 18-19 (1940).

141.    The ancient adage that a fish rots from the head down is sadly true here.  The DOJ's pervasive contempt for the rule of law starts at its most senior levels.  Abundant examples—some chillingly similar to what happened to Walters—demonstrate an ingrained attitude that the law does not apply to the law enforcers.  Lying under oath and obstructing justice has become a *modus operandi* for far too many federal law enforcement personnel from the front office to the front lines.  And nowhere are these abhorrent practices more ingrained than in the Southern District of New York.

142.    Take, for example, Andrew McCabe, the former Deputy Director and Acting Director of the FBI, who was terminated by President Trump.  In April 2018, DOJ Inspector General Michael Horowitz, a widely-respected, independent-minded, and vigorous investigator, disclosed that McCabe had brazenly lied to the Bureau's internal investigators to cover up a leak that he orchestrated about Hillary Clinton's family foundation less than two weeks before the 2016 Presidential election.

143.    McCabe's egregious misconduct has shaken the FBI.  Lying to investigators—a felony under 18 U.S.C. § 1001—is an appalling crime, and especially so in a federal law enforcement agency built on trust.  McCabe's disregard for the law sends a signal to the FBI's 35,000 employees that the ends justify the means.

144.    McCabe's boss, former FBI Director James B. Comey (who also was fired by President Trump), flagrantly violated DOJ protocols in a July 15, 2016, press conference—less than four months before the election—when he criticized Hillary Clinton for using a private email server as Secretary of State even though he cleared her of any wrongdoing.  This was an insidious form of leaking in plain sight.  Comey breached DOJ rules when he announced—only

two weeks before the election—that he was reopening a criminal investigation into Clinton's private emails.  The DOJ has a longstanding policy against such public disclosures—especially in the months leading up to the election—without the approval of the Attorney General or his designee.

145.    After his termination in May 2017, Comey admitted that he leaked his memoranda about private conversations with the President to *The New York Times*, prompting Inspector General Horowitz to condemn this conduct as "dangerous."

### **Weaponizing Leaks**

146.    During Comey's tenure as FBI Director, leaks became a favorite (and illegitimate) weapon of federal law enforcement in its self-proclaimed "War on White Collar Crime."  In this Culture of Leaks, no citizen was safe.

147.    After investigating the origins of the FBI counterintelligence investigation of then-candidate Trump's campaign in 2016, Inspector General Horowitz, in a 434-page report issued last December, found 17 "significant errors or omissions" in four Foreign Intelligence Surveillance Act ("FISA") wiretap applications for Trump campaign aide Carter Page.  Horowitz also determined that a former FBI lawyer, Kenneth Clinesmith, might have falsified a document relating to one 2016 FISA wiretap application for Page.  Recently, Clinesmith pled guilty to doctoring this email and now faces imprisonment.

148.    Horowitz squarely placed the blame for the FISA imbroglio on senior DOJ and FBI officials for inadequate oversight.  "So many basic and fundamental errors were made by three separate, hand-picked teams on one of the most sensitive FBI investigations that was briefed to the highest levels within the FBI."  There was a failure of "not only the operational team, but also of the managers and supervisors, including senior officials, in the chain of

-44-

command."

149.    Inspector General Horowitz's report prompted Attorney General William P. Barr to observe that the DOJ and FBI "used the apparatus of the state, principally the law enforcement agencies and intelligence agencies, both to spy on political opponents, but also to use them in a way that could affect the outcome of the election."

### The Fox Is Guarding The Henhouse

150.    Last year, DOJ discovered a former FBI Deputy Assistant Director had violated the law by leaking sealed court documents to the media, engaged in repeated unauthorized contacts with journalists, and accepted a gift from a reporter.  Once again, the DOJ declined to prosecute or discipline one of their own.

151.    The USAO and the FBI have demonstrated that they are incapable of policing themselves.  Their response to allegations of misconduct is to shoot the messenger.  In a March 2018 report, Inspector General Horowitz determined that FBI retaliation against internal whistle-blowers was continuing, notwithstanding years of Bureau pledges to end this illegal conduct.

152.    FBI leadership rarely admits mistakes and eschews transparency.  The inveterate response to revelations of misconduct is to circle the wagons.  A culture of cover-up, where discipline is rarely imposed and accountability is absent, simply breeds more lawlessness.

153.    The DOJ's Office of Professional Responsibility ("OPR") is charged with investigating misconduct by DOJ attorneys.  OPR states that its "primary mission is to ensure that Department [of Justice] perform their duties in accordance with the high professional standards expected of the nation's principal law enforcement agency."   In reality, OPR is a notorious black hole where investigations of serious misconduct go to die.  The same is true of the FBI's OPR.

154.    OPR has become a safe haven for bad apples in the ranks of DOJ attorneys.  The putative disciplinarians do not discipline—they whitewash cases of misconduct.  As reported by The Intercept, as with David Chaves, "a large majority of DOJ employees who face allegations of professional misconduct—including federal prosecutors—continue to retire, resign or move on to another position before any discipline . . . ."  Brooke Williams, Samata Joshi, Shawn Musgrave, "How the Secretive 'Discipline' Process For Federal Prosecutors Buries Misconduct Cases," https://theintercept.com/2019/10/10/justice-department-federal-prosecutors-accountability/.  A few years ago, the Government Accountability Office found that OPR was failing to ensure that wayward prosecutors were disciplined—indeed, some who were supposed to be punished were receiving bonuses.  The fox is guarding the henhouse.

155.    The same deficiencies in the DOJ's OPR for attorneys plague the FBI's disciplinary process—no transparency, no track record of discipline commensurate with the misconduct, and no accountability.  During the past five years, the number of FBI agents disciplined for serious misconduct—much less prosecuted—can be counted on two hands.

**No Meaningful Reform**

156.    The ethos of federal law enforcement when confronted with irrefutable evidence of misconduct—obfuscation, denial, and unaccountability—dooms any opportunity for meaningful reform.  Failing to hold law-defying law enforcement officials accountable sends a message to the rank-and-file that this conduct is condoned, if not encouraged.  Andrew McCarthy, a senior fellow at the National Review Institute, wrote: "Once law enforcement saw the virtue in self-policing, in a duty to expose and purge itself of rogue actors.  Now, it tends toward not just burying bad behavior but — the best defense being a good offense — hiding it behind claims of a job well done, behind claims that its ends are so noble its means are justified

-46-

no matter how unseemly."   Andrew C. McCarthy, "Problems at the Justice Department and FBI Are Serious," National Review, June 16, 2018

(https://www.nationalreview.com/2018/06/misconduct-at-fbi-department-of-justice/).

157.    Congress has utterly failed to stem the flood of leaks.  Through its constitutional oversight function, it has the power—and the duty—to call the DOJ and FBI to task for leaking and doing nothing to root out the culprits for prosecution and discipline.  Its failure to do so aids and abets those who elevate expediency over obeying the law.

158.    In light of the chronic failure of the DOJ's and FBI's toothless disciplinary arms to punish law enforcement officials who trammel on citizen's fundamental constitutional rights, it is little wonder that Chaves skated.  Indeed, it is not even known if any kind of legitimate investigation was ever undertaken.

159.    Sadly, too many DOJ attorneys and FBI agents, in their zeal to fight crime, have become criminals.  The rule of law is subverted when law enforcers become law breakers.  They have lost their way, ignoring law enforcement's duty to seek justice and provide a fair process to targets of investigation.  With no effective checks and balances to punish these wrongdoers, the abuses will continue to multiply.

160.    The Government's campaign to deprive Walters of his constitutional right to a fair, just, and impartial investigation succeeded.  The institutional processes for holding the perpetrators accountable failed.  This lawsuit is Walters' last chance to expose the cover-up of the monumental misconduct by both Chaves and the supervisors who were supposed to prevent and plug his leaking of grand jury secrets.  Securing a public judicial declaration of the violation of his basic constitutional right to due process will benefit his fellow citizens by shining the antiseptic light of public scrutiny on the darkness where official lawlessness hides.  History

teaches us that sunlight is the best disinfectant.

**Damages**

161.    As a direct and proximate result of the unlawful actions of Defendants, Plaintiff suffered and continues to suffer substantial injuries and damages.  These injuries include deprivations of Plaintiff's due process rights, including the right to a fair, just, and impartial investigation, grand jury proceeding, and/or trial, which are actionable *per se*.  *Carey v. Piphus*, 435 U.S. 247, 266–67 (1978); *Farrar v. Hobby*, 506 U.S. 103, 112 (1992).

162.    Plaintiff also has suffered direct damages, including legal fees and costs associated with uncovering Defendants' illegal conduct, damage to his reputation and business interests, and public ridicule and humiliation beyond that suffered as a result of his prosecution and conviction.

163.    These injuries and damages were a directly foreseeable result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions.

## FIRST CLAIM FOR RELIEF

### Fifth Amendment Claim for Violation of Plaintiff's Due Process Rights

### Against All Defendants

164.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs as though set forth fully herein, and further alleges as follows:

165.    Chaves deliberately and willfully divulged confidential information pertaining to an ongoing secret grand jury investigation to the media in knowing violation of his duties and obligations as a federal law enforcement agent.  These illegal leaks, occurring over a period of many months, persisted even after members of the Department of Justice directly admonished

him to cease communicating with the press about the Department's investigation of Walters. Chaves engaged in this campaign of illegal leaking to revive a dormant investigation against Walters and, in so doing, knowingly deprived Walters of his constitutional right to a fair, just, and impartial criminal investigation, grand jury proceeding, and trial. No reasonable FBI agent would have believed that Chaves' conduct was lawful and did not violate Walters' constitutional rights.

166.    Defendants Venizelos, Zabel, Kasulis and Bharara, individually and in concert, had full knowledge that one or more agents of the Department of Justice were engaged in an illegal campaign to disclose confidential grand jury material to the press with the express goal of influencing an ongoing investigation. Despite this knowledge, Venizelos, Zabel, Kasulis, and Bharara took no steps to meaningfully investigate, impede, or remedy the unlawful conduct and prevent the harm caused to Walters. Venizelos, Zabel, Kasulis, and Bharara, and each of them, reaped the benefits of Chaves' unlawful conduct (including to the extent that it resuscitated their investigation into Plaintiff) and, through their deliberate inaction, allowed the illegal conduct to continue unabated.

167.    Bharara, Zabel, Kasulis, and Goldman intentionally misled and deceived the trial judge in Walters' criminal case when they filed dishonest pleadings opposing Walters' efforts to learn the truth about the Government's illegal conduct. They knew that they were making material misrepresentations with the intent to obstruct justice and persuade the trial judge not to investigate. This deliberate lack of candor was in furtherance of their conspiracy to cover up the Department's wrongdoing in leaking and failing to investigate.

168.    Defendants' misconduct deprived Plaintiff of his clearly established constitutional rights under the Fifth Amendment of the United States Constitution, including his procedural and

substantive due process rights. Defendants performed the above-described acts under color of federal law, in their capacities as FBI Special Agents, FBI Assistant Director, AUSA, Deputy USA, and/or USA. No reasonable federal prosecutor or agent would have believed that this conduct was lawful—in fact, Defendants admitted repeatedly that they knew such conduct was *unlawful*. And no reasonable federal prosecutor or agent would believe that failing to investigate and stop the leaks, and then misleading a federal judge about what happened, is lawful.

169.    As a direct and proximate result of the above-described conduct, Plaintiff suffered deprivation of his constitutional rights, as well as further damages in an amount to be proven at trial.

170.    Defendants acted with malice, fraud, and oppression, entitling Plaintiff to an award of punitive damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Declaratory Judgment

### Against All Defendants

171.    Plaintiff hereby incorporates by reference all of the foregoing paragraphs as though set forth fully herein, and further alleges as follows:

172.    On information and belief, Defendants deny that they have infringed any of Plaintiff's constitutional rights.

173.    An actual, present and justiciable controversy has arisen between Plaintiff and Defendants concerning Defendants' infringement of Plaintiff's constitutional rights.

174.    Plaintiff seeks a declaration from this Court that the above-described conduct of Defendants, and each of them, violated his constitutional rights, including his Fifth Amendment right to procedural and substantive due process. In particular, Defendants engaged in a pervasive

campaign and cover-up to deprive Plaintiff of his constitutional right to a procedurally fair, just, and impartial investigation, grand jury proceeding, and criminal trial.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all issues and claims in this Complaint, pursuant to the Seventh Amendment to the United States Constitution.

**WHEREFORE**, Plaintiff William T. Walters prays as follows:

a.   For a trial by jury;

b.   That the Court award compensatory damages to him and against Defendants, jointly and severally, in an amount to be determined at trial;

c.   That the Court award punitive damages to him and against Defendants, jointly and severally, in an amount to be determined at trial;

d.   For pre-judgment and post-judgment interest and recovery of costs;

e.   For an award of attorney's fees and costs;

f.   For declaratory relief, including a declaration that Defendants violated Plaintiff's constitutional rights; and

g.   For any and all other relief to which he may be entitled.

92101-00002/3876779.18

Dated:  New York, New York.
        October 22, 2020

Respectfully submitted,

Greenberg Glusker Fields Claman &
Machtinger LLP
2049 Century Park East
Suite 2600
Los Angeles, California 90067
Tel.: 310.553.3610
Pierce O'Donnell (PO-5724)


By: _/s/_____
      Pierce O'Donnell (PO-5724)


Chehebar Deveney & Phillips
485 Madison Avenue Suite 1301
New York, New York 10022
Tel.: 212-532-8204
Cornelius P. Mccarthy (CM-3544)


By: _/s/_____
      Cornelius P. McCarthy (CM-3544)

92101-00002/3876779.18